Filed 6/10/22  P. v. Maciel CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060934 |
| v. | (Super. Ct. No. 18CR006880) |
| REGINO CANDIA MACIEL, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Monterey County, Carrie McIntyre Panetta, Judge.  Affirmed with limited remand.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Catherine A. Rivlin and Allen R. Crown, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

## INTRODUCTION

A jury convicted Regino Candia Maciel of 21 counts of committing lewd acts on a child under age 14 (Pen. Code, § 288, subd. (a)),[1] four counts of committing sexual penetration by a foreign object on a child under age 14 (§ 289, subd. (j)), and one count of committing oral copulation with a child under 16 years (§ 288a, subd. (b)(2)). The trial court sentenced Maciel to a prison term of 46 years.

On appeal, Maciel argues the trial court erred by (1) excluding testimony that the victim's mother, as a child, had been sexually abused by her father, (2) allowing the prosecution to present expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS), and (3) instructing the jury with CALCRIM No. 362 on consciousness of guilt. In addition, as to his sentence, Maciel argues his trial counsel was ineffective for not objecting to the fines, fees, and assessments imposed on the ground Maciel is unable to pay them, and the abstract of judgment should be modified to reflect the correct amount of the sex offender fine under section 290.3.

We reject Maciel's claims of trial court error. We conclude Maciel suffered no prejudice from his trial counsel's failure to object to the fines, fees and assessments imposed, but the trial court erred in its calculation of the sex offender fine and related assessments. We therefore remand for the limited purpose of recalculating the sex offender fine and in all other respects affirm the judgment.

## FACTS

### I. Maciel Sexually Abuses Jane Doe for Years

At the time of trial, Jane Doe was 31 years old and living in Virginia. As a child, she lived with her mother, G.M. (Mother), and her brothers in Salinas, California.

Maciel met Mother in 1991. At that time, Mother had two sons (D.V. and J.S.) and a daughter, Jane Doe, who was three years of age. D.V. was three years older

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

2

than Jane Doe, and J.S. was two years younger. Maciel and Mother together had twin sons (D.C. and I.C.), who were about four years younger than Jane Doe. Mother worked full time in the fields packing lettuce, sometimes worked longer than an eight-hour day, and after work attended an English language class from 6:00 p.m. to 9:00 p.m. Although Mother and Maciel never married, her children considered him to be their father and had a close relationship with him.

Maciel started molesting Jane Doe when she was four or five years old. He would touch Jane Doe on her vagina, placing his hands under her clothing. Over the next nine to 10 years, Maciel molested Jane Doe hundreds of times.

When Jane Doe was five or six years old, the family moved, and Maciel started molesting her more often. The new home had three bedrooms. Jane Doe shared a bedroom with one of her brothers, and Maciel and Mother shared the master bedroom. Maciel would enter Jane Doe's bedroom in the middle of the night, slip his hand underneath Jane Doe's pajamas or pull her pants down, and, without saying anything, insert his fingers into Jane Doe's vagina. Sometimes, but not often, he would touch Jane Doe's breasts, and sometimes he would make Jane Doe touch his penis. On more than one occasion, Maciel snuck into the bathroom while Jane Doe was undressed and about to get into the shower, touched her breasts, and inserted his fingers into her vagina. On occasion, while Mother was at work, Maciel would send the boys outside to play so that he could molest Jane Doe.

As Jane Doe grew older, Maciel would molest her more often – several times a week when she was age six through nine. She did not yell or fight back. When she was four or five years old, Maciel told her not to tell anybody what he was doing. She was confused; she trusted Maciel and did not understand that what he was doing was wrong and abnormal. She did not know what would happen if she said anything.

When she was nine or 10 years old, the family moved to another house for a few months and then moved into another home (the Snug Harbor home), where Jane

3

Doe lived with her family for about four years. The Snug Harbor home had two stories and three bedrooms. Jane Doe slept in her own bed in the upstairs bedroom, which she shared with her younger brothers. Maciel and Mother slept in a downstairs bedroom.

While at the Snug Harbor home, Maciel would continue to touch Jane Doe during the night, as he had done previously, but the types of molestation gradually got worse. Maciel began performing oral sex on her three times a week. Maciel would combine oral sex with digital penetration and on many occasions used a vibrator on her vagina. If one of Jane Doe's brothers moved a bit, Maciel would become frightened and throw the covers over her. After using the vibrator on her, Maciel routinely would masturbate or have her manually copulate him, and would ejaculate on her abdomen. Maciel continued to perform these acts on Jane Doe until she was 14 years old, when she moved to Mexico to live with an aunt and grandmother.

When Jane Doe was 11 or 12 years old, Maciel began the practice of placing his penis on the outside of her vagina or between the cheeks of her buttocks and moving back and forth until he ejaculated. Maciel would ejaculate on Jane Doe's breasts, back, or abdomen. Maciel also would have her orally copulate him. When she was 12 years old, her breasts started to develop, and Maciel would press her breasts together and place his penis between them until he ejaculated. The penis rubbing and oral copulation would take place during the day as well as at night, sometimes in the upstairs bedroom, sometimes in a downstairs bedroom, and at other times in a bathroom.

Maciel first attempted to have sexual intercourse with Jane Doe when she was 11 years old. He bent her over an entertainment center in a bedroom and started to insert his penis into her vagina. He stopped when she said it hurt her. He tried to do the same thing again later while in a bathroom. This time, he placed lubricant in her vagina and on his penis. She again told Maciel he was hurting her, and he stopped.

When Jane Doe was 12 through 14 years old, Maciel on many occasions inserted some portion of his penis into her vagina. Once, when she was 12 or 13 years

4

old, Maciel had her put on a skirt with no underwear and had her sit on his penis. She said it hurt her, and he stopped.

Jane Doe began having her period when she was just shy of 12 years old. A few months later, her period was late. Maciel became concerned. He bought a pregnancy test and had her take it. The test was negative, and Maciel disposed of the test stick and packaging.

In June 2002, when she was 12 or 13 years old, Jane Doe was outside her home with a boy and kissed him. Maciel saw her kiss the boy and became upset. A confrontation ensued and Maciel slapped her. A neighbor saw Maciel slap her and called the police. She did not say anything to the police officers about Maciel molesting her because the police interview was not private and she was not comfortable talking about sex in front of other people.

## II. The Incident in the Upstairs Bedroom

J.V. is Mother's sister and lives in Mexico. In 2003, J.V. visited Mother and stayed for several months in the Snug Harbor home.

One day in July 2003, when Jane Doe was 14 years old and Mother was away, Maciel sent the boys outside to play and, in the upstairs bedroom, had the girl orally copulate him. After about two minutes, J.V. walked into the bedroom. Jane Doe was kneeling in front of Maciel, who was startled and tried to pull his pants up. Jane Doe was scared; she stood up and moved to the side of an entertainment center in the bedroom. J.V. left the bedroom. Maciel told Jane Doe not to say anything.

J.V. testified that when she entered the upstairs bedroom she saw Jane Doe standing in the corner of the bedroom facing her. J.V. saw Maciel, shirtless, holding his penis outside of his black pants.

Maciel testified he had gone to the upstairs bedroom to retrieve a cordless telephone he believed Jane Doe might have. Jane Doe handed Maciel the telephone, and

5

he went back downstairs.  Maciel testified he believed J.V. saw him holding the cordless telephone.

When J.V. questioned Jane Doe, she denied anything had happened in the upstairs bedroom.  When Mother returned home, J.V. told her what she had seen in the bedroom.  They called Jane Doe over and asked her what had happened.  She was scared and confused; she denied anything had happened because she did not feel safe making a disclosure at that time.  An argument erupted.  There was a lot of screaming and displays of emotion.  Mother cried but she believed J.V.  Maciel left the house that night and did not live with the family again.

A few days later, Mother moved the family to Mexico.  After about a month, Mother and the boys returned to the United States but Jane Doe stayed with J.V. in Mexico for about six months.  J.V. once took her to lunch and asked her about what had happened with Maciel in the upstairs bedroom.  She would not tell J.V. anything.  That was the only time J.V. asked her about the incident in the upstairs bedroom.

### III.  Jane Doe Reveals Maciel's Sexual Abuse

For several years, Jane Doe never told anyone about what Maciel had done to her.  Whenever Mother asked her about the incident in the upstairs bedroom, she denied anything had happened.  She was scared and confused:  She did know that what Maciel had done was abnormal or wrong.

Mother moved with Jane Doe and her brothers D.V. and J.S. to Yuma, Arizona.  D.C. and I.C. stayed with Maciel.  In Yuma, Jane Doe became best friends with a classmate named K.  When Jane Doe was 16 or 17 years, old she confided in K. that Maciel had made her do "sexual things."  She had tears in her eyes and spoke slowly when she made this revelation.

In 2014, her brother D.C. asked Maciel if he had sexually assaulted Jane Doe when she was a child.  Maciel remained silent for a long time; he appeared pensive

6

and did not look D.C. in the eye.  D.C. told Maciel he loved him, we all make mistakes, and he just wanted to know the truth.  After about an hour of silence, Maciel denied the allegations without offering an explanation to clear up any sort of misunderstanding.  At the end of the conversation, Maciel asked D.C. to forgive him and said "he wished that we would never become like him."

In late 2017 or early 2018, D.C., who was about to be deployed to Afghanistan, sent a text message to Jane Doe asking her about what had happened between Maciel and her.  D.C. wanted to understand why his family broke up and was concerned about the suffering Jane Doe might have endured.  After sending the text message, he spoke by telephone with her.  At that moment, she realized she "couldn't keep it in me anymore" and decided she was ready to come forward and let her family know what Maciel had done to her.  D.C. was surprised by her response to his questions, but believed her.  Jane Doe had a daughter, as did her brother J.S., and she said she "couldn't live [with herself] if something like that" happened to them.

### IV.  Jane Doe's Report to the Police; the Pretext Call

In March or April 2018, Jane Doe, who was living in Virginia, flew at her own expense to Salinas to make a police report in person.  Her brother D.V. drove her to the police station.  She told a police officer that Maciel had sexually assaulted her "many times a week for many years" and the abuse had occurred more often and became more intense as she grew older.

Salinas police detective Gabriel Gonzalez asked Jane Doe to make a pretext call to Maciel, but she was too scared and nervous to do it.  Detective Gonzalez then arranged for a female detective, Gabriela Garibay, to make the call and pretend to be Jane Doe.  The ruse could be plausible, they believed, because Jane Doe had not spoken to Maciel since she was a teenager.

7

On July 5, 2018, before the call, Gonzalez sent Maciel a text message to confirm the telephone number was correct. Maciel texted back to confirm. A series of text messages in Spanish followed on July 5, 6, 17, 18, and 19, 2018. In one message, Gonzalez said she (Jane Doe) wanted to speak with Maciel; he agreed. Gonzalez then sent this message to Maciel: "'I've been speaking with a therapist,' . . . 'I got really depressed. My therapist thinks that I'm like this because of what you . . . were doing to me. I honestly don't understand how you could have raped me for so many years when I was a child. Please answer me. I want an explanation.'" Maciel did not respond. Gonzalez sent several more messages. One read, "'I honestly don't understand how you could have raped me for so many years. I was a child.'"

Eventually, Maciel sent a reply text message stating: "'Call me. Let's talk about this in person. Just tell me when. I'm a little busy right now.'" Gonzalez responded by a text message stating, "'[a]fter everything you did to me, you can't explain to me why you raped me?'" There was no response for about a minute. After a few more back and forth text messages, Garibay, a fluent Spanish speaker, dialed Maciel's telephone number and pretended to be Jane Doe.

The pretext call was made on July 5, 2018 and lasted from 4:56 p.m. to 5:28 p.m. The call was recorded and played for the jury with an English language translation. During the call, Maciel asked the caller whether she was really Jane Doe and why she had waited so long to call him. Garibay told Maciel that she wanted an explanation because she had been very depressed due to what Maciel had done to her. Garibay told Maciel he had raped her and touched her vagina and now she was suffering. Maciel denied raping her or touching her vagina; he said he wanted to meet her in person and did not believe she was Jane Doe. Garibay said she did not want to meet Maciel in person but wanted an explanation and an apology so she could find peace.

Maciel told Garibay that if she was Jane Doe and if he had harmed her, then he apologized. Garibay repeatedly pressed Maciel for an explanation why he raped her

8

and touched her vagina.  He repeatedly denied raping Jane Doe, but again apologized if he had caused her any harm.  Several more times Maciel denied raping Jane Doe and apologized for any harm he might have caused her.  The call ended with Garibay telling Maciel she intended to call the police.

About eight minutes after the pretext call ended, Maciel sent Jane Doe a text message asking for forgiveness and stating, "'I'm telling you from my heart that I loved you a lot.'"  The next day, Gonzalez sent Maciel a text message stating:  "'Well, but why were you having sex with me?  You were hurting me physically and emotionally.'"  Maciel responded by a text message stating:  "'I didn't sleep last night.  You're tormenting me.  Please, let's speak in person sometime in the future, or do whatever you have to do.  If that . . . will make you feel better.  You know I have another family and a little baby.  Why wait so long?'"

On July 17, 2018, Gonzalez, again pretending to be Jane Doe, sent a text message to Maciel stating, "'I'm going to Salinas, and will you see me?'"  They exchanged messages and agreed to meet on July 19, 2018, at noon, at the Disney store at a mall.  Detective Gonzalez and another police officer met Maciel in front of the Disney store on the appointed date and time and arrested him.

## DISCUSSION

### I.  The Trial Court Did Not Err by Excluding Evidence That Mother Had Been Sexually Abused as a Child

Maciel argues the trial court committed reversible error by excluding testimony that Mother, as a child, had been sexually abused by her father, and that revelation of this abuse had been traumatic for her entire family, including J.V.  The trial court excluded the testimony pursuant to Evidence Code section 352.  We conclude the trial court did not err by excluding the testimony.

9

## A. *Background*

The prosecution called Mother as a witness at trial. During cross-examination, Mother testified she never saw or heard anything that would cause her to be concerned over the way Maciel behaved with her children. Defense counsel asked Mother if she would have done something had she seen or heard anything that did cause her to be alarmed. The trial court sustained the prosecution's objection on the ground of speculation. Defense counsel then asked Mother, "[d]o you yourself have a personal history involving sexual assault?" The trial court sustained the prosecution's relevance objection and denied defense counsel's request for a sidebar conference. Mother then testified that, before J.V.'s report, she had no concerns about Maciel's behavior around her children, including Jane Doe, and Maciel had acted like a father who loved Jane Doe like a daughter.

Once the jury was excused for the lunch break, the trial court returned to the issue of evidence of Mother's sexual abuse as a child. The court related that defense counsel, following a juror question, had made an offer of proof that, in Mexico, Mother had a meeting with other family members, including J.V., to address Mother having been sexually abused as a child; J.V. was therefore prone to have misperceived Maciel's behavior in the upstairs bedroom as sexual abuse.

Defense counsel added that testimony about Mother's own sexual abuse was relevant to the defense theory that Jane Doe had been "primed" to believed Maciel had sexually abused her: "This is an area where I anticipate, if allowed, Dr. Debra Davis, our hoped-for expert, would testify that a person's experiences and . . . personal history can and does deeply affect both their perception of any individual event as well as afterwards their memory of that event. And this is something specifically that I believe that [Dr. Davis] referred to in the literature and studies as the 'priming affect.'"

The trial court concluded the testimony about Mother being sexually abused would be excluded based on an Evidence Code section 352 analysis. Defense

10

counsel then made another offer of proof:  "[T]he defense proffer would be that . . . [Mother] herself was molested by her father.  This was a very big deal for [Mother] and her immediate family, naturally, to the extent that at some point during [Mother]'s relationship with [Maciel], there was a big family confrontation with the father in Mexico.  [Mother] was present, [J.V.] was present, [Maciel] was present, and naturally the grandfather, [Mother]'s father was present.  [¶] We believe that this was a very emotional event, and it affected everybody involved.  In particular, it affected the two daughters of this man, both of them witnesses in this case.  So not only does it go to the fact [the] People have tried to elicit that at the age [of] four, Jane Doe made a complaint to her mom and mom ignored it, this goes to that mom would not have ignored it in light of her own sexual abuse history."

### B.  *Evidence Code Section 352 and Standard of Review*

Only relevant evidence is admissible (Evid. Code, § 350; *People v. Crittenden* (1994) 9 Cal.4th 83, 132) and, as a corollary principle, all relevant evidence is admissible unless excluded by constitution or statute (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d)).  Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)

Evidence Code section 352 grants the trial court discretion to exclude relevant evidence if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  "Under Evidence Code section 352, the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)

11

A trial court's decision to admit or exclude evidence pursuant to Evidence Code section 352 is reviewed under the abuse of discretion standard. (*People v. Rogers* (2013) 57 Cal.4th 296, 326.) "Under Evidence Code section 352, the trial court enjoys broad discretion." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) Reversal under the abuse of discretion standard is required only when the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner resulting in a miscarriage of justice. (*People v. Steskal* (2021) 11 Cal.5th 332, 357.)

### C. *Testimony That Mother Had Been Sexually Abused as a Child Was Irrelevant*

#### 1. The Testimony Was Irrelevant to the Issue of False Memory

Maciel argues testimony from Mother that she had been sexually abused as a child was relevant to impeach Jane Doe's testimony by showing Jane Doe's reports of abuse were the product of false memory. He argues: "The jury would have learned that both [Mother] and [J.V.] had unfortunately experienced things in their lives that could have tainted or influence[d] their approach to Jane [Doe] regarding the abuse at the time it occurred."

Testimony about false memory came from Deborah Davis, Ph.D., a defense expert in the field of psychology and memory. She testified people do give false reports of sexual abuse and other dramatic events; while some such people deliberately lie, others are led to have false memories by experiences, suggestions, or questions they had been asked. People may have distorted memories of what happened or even have memories of things that never happened; memory fades over time and can change so that things that never happened can feel more real than things that did happen.

Dr. Davis testified about two ways in which people may develop false memories concerning sexual abuse. One way is called "priming," which is a process by which ideas are introduced into someone's mind, and those ideas then direct the cognitive process. "It makes your mind call up other things that are relevant to what's been

12

primed. . . . [W]hen you look at the world, then you're more likely to see things relevant to what has been primed and interpreted in that way."

Another way a false memory about sexual abuse can be created is through repeated questioning or discussion. Repeated questioning conveys the message that the person asking the questions is not happy with the answers given by the person being questioned. This can have a number of effects on the person being questioned. The person being questioned might change his or her answer to satisfy the questioner or might tire of hearing the questions and change his or her answers to get the questioning to stop. The repeated questioning might lead the person being questioned to believe his or her initial answers to the questions were incorrect.

The amount of time necessary to create false memories of sexual abuse varies. Dr. Davis testified a person can very quickly develop the false belief that he or she had been sexually abused particularly if that person has been told by someone credible the abuse did occur. If the person is initially convinced the sexual abuse did not occur, it might take a lot of influence from other people and a long period of time thinking about the subject to form the false memory.

Dr. Davis had never interviewed sexual assault victims regarding their memories of sexual assaults. She recognized that sexual abuse does happen, not every memory of sexual abuse is false, and people can have real, accurate memories of being abused.

Evidence of whether Mother had been sexually abused as a child had no relevance to the issue of whether Jane Doe had false memories of being abused by Maciel. Dr. Davis testified that false memories of sexual abuse can be created either by repeated questioning or by implanting ideas about sexual abuse. The relevant inquiry in either scenario is the number, substance, and nature of the communications between the questioner and the subject. Whether or not Jane Doe had been primed to have false memories would depend therefore on the number, substance, and nature of the

13

questioning by Mother and J.V. The theory that Jane Doe was influenced by repeated questioning has to do with the frequency of the questioning. The theory that Jane Doe was primed by having ideas about sexual abuse introduced into her mind has to do with what Mother and J.V. told Jane Doe during questioning and the manner in which she was questioned. Thus, what matters is what Mother and J.V. actually said to Jane Doe and how often and the manner in which they said it.

Defense counsel was free to elicit testimony about the number, substance, and nature of communications between Mother or J.V. and Jane Doe.[2] Sustaining the objection to defense counsel's question about Mother's own sexual abuse did not prevent counsel from doing so. For instance, Jane Doe testified that Mother asked her "multiple times" about the incident in the upstairs bedroom and J.V. asked her once about it.

2. The Testimony Was Irrelevant to the Credibility of J.V.

Maciel argues that evidence J.V. had recently learned Mother had been abused as a child colored her view of what she saw in the upstairs bedroom and caused her to believe she saw Maciel's penis when in fact he was only holding a cordless telephone.

Dr. Davis's testimony did not touch upon that theory of relevance. Maciel does not contend J.V. was abused as a child or that J.V. had been primed to create false memories about her own abuse. The issue is not whether, over time, J.V. developed a false memory of what she saw in the upstairs bedroom. Immediately after seeing Jane Doe and Maciel in the upstairs bedroom, J.V. questioned Jane Doe and, once Mother returned home, related to her what had occurred in the upstairs bedroom.

---

[2]    Because defense counsel had the ability to elicit such testimony, the theory of relevance for testimony of Mother's sexual abuse must have been something like this: Mother as child was sexually abused by her father; revelation of this abuse was traumatic for Mother, J.V., and the entire family; therefore, Mother and J.V. *must* have primed Jane Doe into believing Maciel had sexually abused her and such priming was successful. We find this to be speculative.

Any error in excluding the testimony was, with respect to the issue of J.V.'s credibility, harmless. Error under Evidence Code section 352 is evaluated under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Earp* (1999) 20 Cal.4th 826, 878.) Although her testimony about what happened in the upstairs bedroom differed somewhat from J.V.'s, Jane Doe confirmed she had been orally copulating Maciel when J.V. entered. Maciel claims that J.V. mistook a cordless telephone for a penis, which is quite a stretch, and a hard sell to a jury. Defense counsel had the opportunity to cross-examine J.V. and Jane Doe. Even if J.V. were mistaken about what she saw in the upstairs bedroom, that would not diminish Jane Doe's testimony about the years and years of sexual abuse inflicted by Maciel. It is not reasonably probable the verdict would have been more favorable to Maciel if his trial counsel had been able to attempt to impeach J.V. with evidence that she had recently learned her sister had been sexually abused as a child. (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

3. Maciel Fails to Show How the Testimony Was Relevant to Mother's Credibility

Maciel argues testimony by Mother that she had been sexually abused as a child would have impeached Mother's testimony. He offers no further explanation other than to say, "[i]f she had been sexually abused, she would have been more attuned to such abuse with her own daughter." The record citation provided suggests Maciel's argument is the same as the offer of proof at trial, i.e., the testimony was relevant "to the fact [the] People have tried to elicit that at age four, Jane Doe made a complaint to her mom and mom ignored it, this goes to that mom would not have ignored it in light of her own sexual abuse history."

But Maciel does not cite to anyplace in the record at which there is testimony of Jane Doe at age four complaining to Mother about Maciel. Our review of the record has uncovered no testimony or other evidence of Jane Doe ever trying to tell

15

Mother about the sexual abuse. She testified that, before she became an adult, she told only her friend K. about the sexual abuse.

### D. *The Trial Court Did Not Err Under an Evidence Code Section 352 Analysis*

The relevance, if any, of testimony about Mother's own sexual abuse and the revelation of this abuse at a family meeting would have been speculative and slim. The testimony's probative value would have been substantially outweighed by the probability that its admission would necessitate undue consumption of time by creating a mini-trial on the subject of Mother's sexual abuse as a child, the family meeting at which the abuse had been revealed, and the effect the revelation of that abuse had on the family. Testimony on such a highly-charged topic is bound to take time and raise issues about the proper scope and limits of questioning.

In addition, the probative value of the testimony about Mother's sexual abuse was substantially outweighed by the probability that its admission would have confused the jury about who was on trial and who was the victim. We cannot say the trial court abused its broad discretion under Evidence Code section 352 by excluding the testimony.

### II. The Trial Court Did Not Err by Allowing Expert Testimony on CSAAS

### A. *CSAAS: Background and Expert Testimony*

The theory of CSAAS was first presented by Roland C. Summit in *The Child Sexual Abuse Accommodation Syndrome* (1983) 7 Child Abuse & Neglect 177. (See *People v. Bowker* (1988) 203 Cal.App.3d 385, 389, fn. 3.) CSAAS identifies five stages which child sexual abuse victims might undergo: (1) secrecy, (2) helplessness, (3) accommodation, (4) disclosure, and (5) reaction. (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1742.) CSAAS is "a list of those factors which were both most characteristic of child sexual abuse and most provocative of rejection in the prevailing

16

adult mythology about legitimate victims." (Summit, *Abuse of the Child Sexual Abuse Accommodation Syndrome* (1992) 1 J. Child Sexual Abuse 153, 154.)

Over Maciel's objections, the trial court permitted prosecution expert Anthony Urquiza, Ph.D., to testify as an expert on CSAAS and on myths and misconceptions about child sexual abuse. Dr. Urquiza is a psychologist and a professor in the department of pediatrics at the University of California, Davis, Medical Center. He is the director of the Child and Adolescent Abuse Resource and Evaluation (CAARE) Center, which treats children who have suffered abuse, and oversees the treatment by other staff members of over 500 children and families. He personally has treated over a thousand children and continues to conduct research on treatment of children and helps to train therapists.

Dr. Urquiza testified he knew nothing about this case other than Maciel's name. He had never met or treated Jane Doe. He did not form or provide an opinion about whether she had been sexually abused. That was made quite clear.

Dr. Urquiza testified there are myths and misconceptions about child sexual abuse. He testified: (1) The research shows that children who are sexually abused are often abused by somebody they know and with whom they have an ongoing relationship and (2) children who have been sexually abused commonly delay reporting the abuse.

The focus of Dr. Urquiza's testimony was the subject of delayed disclosure of abuse. The length of the delay can be significant: Sometimes months or years pass between the first instance of abuse to the initial effort to disclose. There are many reasons why a child victim of sexual abuse might delay reporting the abuse. More often than not, the child is afraid of disclosing the abuse because the abuser has intimidated the child, threatened to harm the child if the child discloses the abuse, the abuser is bigger or stronger than the child, or the child has seen the abuser inflict corporal punishment or engage in domestic violence. The power imbalance between the abuser and the abused means the abuser controls the relationship and can manipulate it. Another reason for

17

delayed disclosure is the child might be involved in an ongoing relationship with the abuser. The child might receive a lot of attention and affection from the abuser and might like or even love the abuser. The child might fear that disclosing the abuse could lead to something bad happening to the abuser or to the family.

Child sexual abuse victims, particularly older ones who know child abuse is wrong, might be concerned they could get in trouble if they report the abuse. Victims might feel ashamed because they were involved in the sexual abuse. Research shows that child sexual abuse victims fear adults will not take them seriously, thereby making disclosure a futile act. Research also shows that child sexual abuse victims often will deny having been abused if asked about it.

Child sexual abuse victims do not necessarily show hatred of or disdain toward their abusers and may feel ambivalent or confused about their relationship with them. The victim may have grown up with and genuinely loved the abuser, who might play a significant emotional role in the victim's life.

Child sexual abuse victims often suppress their feelings about the abuse ("compartmentalize") in order to appear normal and "disassociate" from the trauma, anxiety, fear, depression, and unpleasant feelings caused by sexual abuse. By disassociating, the victims are able to cope more easily while undergoing sexual abuse. Child sexual abuse victims do not express their feelings about abuse in a uniform way. They often can suppress and disassociate their feelings to the point at which even people close to the victim cannot discern that the child has been abused. For example, studies have shown that child sexual abuse victims in the fourth or fifth grade appear to be no different than other children. The victim could be undergoing sexual abuse one moment, and a few minutes later, after the abuse has stopped, appear as though nothing unusual had happened. It is possible a sexually abused child will even seek out the abuser if the child has a relationship in which the child enjoys and cares about the abuser.

Research shows too that while child sexual abuse victims remember the experience of being abused, there are limitations on a child's ability to recall past events about being sexually abused, particularly if the abuse occurred many times. For example, it would be easier to remember a single incident of sexual abuse than abuse that occurred 50 times. The 50 incidents of abuse might become "muddled together" such that the victim will remember the nature of the sexual acts but might not have observed details such as the abuser's clothing.

Dr. Urquiza testified the substance of his testimony was not completely based on CSAAS. Although delayed disclosure is one of the aspects of CSAAS, his answers to questions about delayed disclosure were based on "an abundance of research" and his own experience as a clinician treating sexually abused children.

Dr. Urquiza testified CSAAS is not listed in the Diagnostic Statistical Manual[3] (DSM) because it is not a mental health disorder. The CSAAS and the subjects of Dr. Urquiza's testimony "are the description of how children respond to the experience of being sexually victimized." CSAAS was not intended as a diagnostic tool to determine whether a child had been sexually abused; rather, it is a means of educating therapists about children's responses to being sexually abused.

After Dr. Urquiza testified, the trial court admonished the jury that Dr. Urquiza's testimony about CSAAS "is not evidence that defendant committed any of the crimes charged against him" and the jury should consider it only to decide whether "[Jane Doe's] conduct was not inconsistent with the conduct of someone who had been molested and in evaluating the believability of other testimony." The trial court instructed the jury with CALCRIM No. 332 regarding expert testimony, CALCRIM No. 360 regarding statements made to an expert, and CALCRIM No. 1193, which specifically addresses limitations on the use of CSAAS testimony.

---

[3] American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013).

19

B.  *The CSAAS Testimony Was Admissible Under California Law*

In *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), the California Supreme Court concluded CSAAS evidence is admissible to rehabilitate the testimony of a child molestation victim "when the defendant suggests that the child's conduct after the incident – e.g., a delay in reporting – is inconsistent with his or her testimony claiming molestation." (*Id.* at p. 1300.)  "'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.  [¶] The great majority of courts approve such expert rebuttal testimony.'"  (*Id.* at p. 1301.)

In *People v. Brown* (2004) 33 Cal.4th 892, the California Supreme Court indirectly confirmed its approval of CSAAS evidence.  The *Brown* court used an analogy to such evidence in reaching its holding that the trial court properly had admitted expert testimony on battered women's syndrome despite the lack of proof the defendant had abused the victim on more than one occasion.  (*Id*. at pp. 895-896, 899-900.)

Since *McAlpin*, a line of cases has followed suit in holding that CSAAS evidence is admissible when offered to show the victim did not act inconsistently with abuse, to dispel common misperceptions about a child's reaction to abuse, or to rebut a defendant's attack on the victim's credibility.  (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 172; *People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*); *People v. Julian* (2019) 34 Cal.App.5th 878, 885; *People v. Wilson* (2019) 33 Cal.App.5th 559, 561; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503; *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069; *People v. Perez* (2010) 182 Cal.App.4th 231, 245; *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001-1002; *In re S.C.* (2006) 138 Cal.App.4th 396, 418 [admissibility in dependency proceedings]; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Yovanov* (1999) 69 Cal.App.4th 392, 406-407; *People v. Patino, supra*, 26 Cal.App.4th at pp. 1744-1745; *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956.)

In the present case, the testimony of Dr. Urquiza was offered for the permissible purposes of showing Jane Doe did not act inconsistently with abuse, to dispel common misperceptions about a child's reaction to abuse, and to rebut Maciel's attack on Jane Doe's credibility. A central theme of the defense was that Jane Doe was not a credible witness given the many opportunities she had to report the abuse, and her failure to do so until she was 29 years old. The defense also attempted to show that throughout her life Jane Doe had displayed affection toward Maciel and nobody, including Mother, ever saw any indication she was being sexually abused. Dr. Urquiza's testimony was admissible to rebut those attempts to discredit her.

Dr. Urquiza's testimony was not offered for the improper purpose of proving Jane Doe had in fact been sexually abused (*People v. Gonzales, supra,* 16 Cal.App.5th at p. 503) or as an opinion on whether she was telling the truth (*Munch, supra*, 52 Cal.App.5th at p. 468). Dr. Urquiza testified he knew nothing about the facts of the case and did not form an opinion about whether she had in fact been sexually abused. The jury was explicitly told his testimony could not show whether the alleged molestation had occurred.

### C. *CSAAS Continues to Be a Valid, Legally Sound Theory That Can Be Effectively Limited to Prevent Its Misuse*

#### 1. CSAAS Remains a Valid Theory for Its Intended Purpose

Maciel urges us to conclude CSAAS evidence is no longer admissible due to studies that have been critical of the theory and of the article that first presented it. But we are bound by *McAlpin*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; see *Munch, supra*, 52 Cal.App.5th at p. 468 [*McAlpin* "is binding on all lower courts in this state"].) Moreover, none of the studies Maciel cites persuades us that Dr. Urquiza's testimony was unreliable or inadmissible.

Maciel argues "recent studies have shown that except for the delayed disclosure component, the remaining CSAAS components are not supported by science

21

or research." Delayed disclosure was, however, a focus of Dr. Urquiza's testimony. Dr. Urquiza's testimony about delayed disclosure, denial, and disassociation was based not only on CSAAS but on "an abundance of research" and his own experience as a clinician treating sexually abused children.

Maciel points out that since Dr. Summit's first article appeared in 1983, neither the American Psychiatric Association nor the American Psychological Association has recognized CSAAS as a syndrome and the DSM does include it in its list of mental health disorders. Maciel cites to articles criticizing CSAAS on the ground it has not been scientifically tested (O'Donohue & Benuto, *Problems with Child Sexual Abuse Accommodation Syndrome* (2012) 9 Sci. Rev. Mental Health Prac. 20) and there is no scientific evidence of a syndrome-like cluster of symptoms or patterns of disclosure among abused children (Zajac et al., *Misconceptions About Childhood Sexual Abuse and Child Witnesses: Implications for Psychological Experts in the Courtroom* (2013) 21 Memory 1, 2).

The criticisms expressed in those articles are in effect directed to the use of the term "syndrome" and misuse of CSAAS for purposes for which it was not designed. Dr. Urquiza agreed CSAAS was not listed as a mental health disorder in the DSM and testified it did not belong there because it is not a mental health disorder. He acknowledged it was not intended as a diagnostic tool to determine whether a child had been sexually abused but to educate therapists about children's responses to being sexually abused. Dr. Urquiza did not purport to use it as a scientific method of determining whether Jane Doe had been sexually abused by Maciel.

Dr. Summit addressed some of those criticisms in a follow-up paper, *Abuse of the Child Sexual Abuse Accommodation Syndrome*, *supra*, 1 J. Child Sexual Abuse 153, in which he himself lamented that CSAAS had been "both elevated as gospel and denounced as dangerous pseudoscience." (*Id.* at p. 153.) Dr. Summit stressed that CSAAS is not a "laboratory hypothesis" or "study of a defined population" but a

"summary of diverse clinical consulting experience." (*Id*. at p. 156.) He wrote, "CSAAS is a clinical opinion, not a scientific instrument." (*Ibid*.) Dr. Summit believed the "misunderstanding" might have stemmed from his use "of the word *syndrome*." (*Id*. at 157.) "I might better have chosen a name like the Child Sexual Abuse Accommodation *Pattern* to avoid any pathological or diagnostic implications." (*Ibid*.)

California law correctly assesses the nature and value of CSAAS and restricts its admission in evidence to its limited purposes. "CSAAS testimony does not purport to provide a definitive truth; rather, the expert testimony attempts to disabuse jurors of misconceptions they might hold about the conduct of children who have been sexually abused." (*People v. Lapenias, supra*, 67 Cal.App.5th at p. 173.) California courts have uniformly held expert CSAAS testimony is not scientific evidence or a scientific method of proof subject to the rules established in *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013. (*People v. Lapenias, supra*, at p. 173; see *Munch, supra*, 52 Cal.App.5th at pp. 472-473; *People v. Harlan* (1996) 222 Cal.App.3d 439, 448-450.) Dr. Urquiza's testimony, which was based on research and on his own experience as a clinician, is not deemed to be scientific evidence but meets "'traditional standards for competent expert opinion, without the need for additional screening procedures.'" (*Munch, supra*, at p. 473.)

2. CSAAS Remains a Legally Sound Theory

Maciel argues we should follow "well-reasoned" decisions from other jurisdictions which, he contends, hold CSAAS evidence to be inadmissible for all purposes. The short response to this argument is we are bound by *McAlpin*. (See *Munch, supra*, 52 Cal.App.5th at p. 468.) California courts have uniformly upheld the use of CSAAS evidence for its intended purpose. We have no reason to look beyond our state borders for guidance.

The longer response is that the out-of-state decisions cited by Maciel do not persuade us that CSAAS is a legally impermissible theory or there is any trend in

23

authority to reject it. Maciel cites *Franklin v. Henry* (9th Cir. 1997) 122 F.3d 1270, 1273, in which the Ninth Circuit Court of Appeals stated, "CSAAS has been examined by several courts in the context of criminal prosecutions and found wanting." But in *Brodit v. Cambra* (9th Cir. 2003) 350 F.3d 985, 991, the Ninth Circuit stated to the contrary, "[w]e have held that CSAAS testimony is admissible in federal child-sexual-abuse trials, when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth."

In *State v. Stribley* (Iowa App. 1995) 532 N.W.2d 170, 173, the Iowa Court of Appeals concluded the CSAAS testimony offered at trial would have been excluded had a proper objection been made. The court's concern was the CSAAS evidence had been used to prove abuse had occurred, and CSAAS "has not been generally accepted in the relevant scientific community *as a means of detecting abuse*." (*Id.* at p. 174, italics added.)

Maciel quotes at length from *Steward v. State* (Ind. 1995) 652 N.E.2d 490, but in that case the Indiana Supreme Court held only that CSAAS evidence was inadmissible to prove a child had been abused. (*Id.* at p. 499.) The court held that in a child sexual abuse case, "once the child's credibility is called into question, proper expert testimony may be appropriate" and recognized, "[b]ecause research generally accepted as scientifically reliable recognizes that child victims of sexual abuse may exhibit unexpected behavior patterns seemingly inconsistent with the claim of abuse, such evidence *may be permissible* under Indiana Evidence Rule 702(a)'s authorization of 'specialized knowledge [which] will assist the trier of fact to understand the evidence.'" (*Id.* at p. 499, italics added.)

Maciel is correct that in *Commonwealth v. Dunkle* (1992) 529 Pa. 168 [602 A.2d 830], the Pennsylvania Supreme Court ruled CSAAS evidence was categorically inadmissible. "But after the *Dunkle* decision, the Pennsylvania Legislature passed a law

24

'providing for the admissibility of this type of expert testimony.'" (*Munch, supra*, 52 Cal.App.5th at p. 469.)

In *Blount v. Commonwealth* (Ky. 2013) 392 S.W.3d 393, 396, the Kentucky Supreme Court confirmed that evidence of CSAAS was inadmissible because it lacked "scientific acceptance." However, Kentucky falls within a small minority of jurisdictions that prohibits all forms of CSAAS testimony. One Kentucky Supreme Court Justice wrote, "Kentucky is one of only six states that traditionally rejected CSAAS testimony on the grounds that it lacks scientific reliability," and of those six, "only Kentucky and Tennessee have adopted an iron-clad prohibition against all manner of CSAAS testimony, devoid of any exceptions." (*King v. Commonwealth* (Ky. 2015) 472 S.W.3d 523, 534 (dis. opn. of Abramson, J.).

In *State v. J.L.G.* (2018) 234 N.J. 265 [190 A.3d 442, 446], the New Jersey Supreme Court retracted its earlier support for CSAAS and concluded, "[b]ased on what is known today, it is no longer possible to conclude that CSAAS has a sufficiently reliable basis in science to be the subject of expert testimony." However, the court concluded testimony on the delayed disclosure aspect of CSAAS was permissible: "We find continued scientific support for only one aspect of the theory – delayed disclosure – because scientists generally accept that a significant percentage of children delay reporting sexual abuse." (*Ibid.*)

The Court of Appeal in *Munch* found *State v. J.L.G., supra*, 190 A.3d 442 to be unpersuasive: "*J.L.G.* involves an aberrant view of CSAAS derived from a contested hearing where four experts testified. [T]he court used a 'restrictive *Frye* "general acceptance" test' that may not be persuasive in jurisdictions not using that test, and 'reasonable people can and no doubt will disagree as to the validity of the court's conclusions.' [Citations.] The court was 'overly dismissive of the "accommodation" aspect of CSAAS.' [Citation.] It found accommodation 'describes the straightforward *reality that all child victims cope with sexual abuse* in one way or another.' [Citation.]

But it would not allow this 'reality' to be presented to juries." (*Munch, supra*, 52 Cal.App.5th at p. 470.)

3. The Trial Court Placed Effective Limits on the Use of CSAAS Testimony

Maciel contends CSAAS evidence is inadmissible because effective limits cannot be placed on its use and, therefore, "in every case, the jury will only use CSAAS testimony as evidence the victim's allegations must be true, and the defendant must be guilty."

But in the present case, Dr. Urquiza testified clearly and unambiguously that he had not treated or even met Jane Doe, he was not offering an opinion on whether she had in fact been sexually abused, and the jury had sole responsibility for determining Maciel's guilt or innocence. He testified in equally clear and unambiguous terms that CSAAS is not a mental health disorder or a diagnostic tool but a means to educate therapists about how children who have been sexually abused respond to their experience.

When Dr. Urquiza concluded his testimony, the trial court instructed the jury that Dr. Urquiza's testimony about CSAAS is not evidence that Maciel committed any of the crimes charged against him. During jury instructions after the close of evidence, the court gave this modified version of CALCRIM No. 1193: "You have heard testimony from Dr. Anthony Urquiza regarding child sexual abuse accommodation syndrome. [¶] Dr. Urquiza's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crime charged against him. [¶] You may consider this evidence only in deciding whether or not Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

CALCRIM No. 1193 correctly instructs the jury on the limits on which CSAAS may be used. (*Munch, supra*, 52 Cal.App.5th at p. 474; *People v. Gonzales, supra*, 16 Cal.App.5th at pp. 503-504.) Our colleagues in the Second District recently

explained: "'A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested. *The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior*.'" (*Munch, supra*, at p. 474.)

Maciel's argument presumes jurors either cannot or will not follow instructions, listen to and understand testimony, and properly assess and weigh evidence. We must presume they can and do. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.) We therefore presume the jurors understood and followed the instructions regarding the appropriate limits of Dr. Urquiza's testimony. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) After hearing the instruction given after Dr. Urquiza testified and CALCRIM No. 1193 during final instructions, no reasonable juror would have believed CSAAS evidence could be used as proof of Maciel's guilt. (See *Munch, supra*, 52 Cal.App.5th at p. 474.)

### D. *CSAAS Testimony Was Specifically Admissible in This Case*

Maciel argues even if CSAAS evidence generally is admissible, it was inadmissible in this case because there was no evidence of any juror having misconceptions about victims of child sexual abuse. He claims the preponderance of juror answers during voir dire "indicated that the jurors had no preconceived notions of how a victim of child sexual abuse would react or act" and "the public no longer holds the presumed misconceptions CSAAS purports to address."

We reject Maciel's contention CSAAS evidence is admissible only upon showing of actual juror misconception. No California law imposes such a condition. To the contrary, as stated in *McAlpin*: "'[T]he admissibility of expert opinion is a question of degree. The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would

27

ever be heard.'" (*McAlpin, supra*, 53 Cal.3d at pp. 1299-1300.) It is enough that a juror "might hold" misconceptions "about how a child reacts to a molestation." (*People v. Patino, supra*, 26 Cal.App.4th at p. 1744; see *id.* at pp. 1744-1745 ["It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation"].)

A purpose of CSAAS evidence is to rebut an attempt to undermine the victim's credibility by suggesting the victim's conduct was inconsistent with having been a victim of sexual abuse as a child. (*McAlpin, supra*, 53 Cal.3d at pp. 1300-1301.) Here, the defense made such an attempt to undermine Jane Doe's credibility. A core element of the defense was to show Jane Doe's conduct, most notably delayed disclosure, was inconsistent with being a victim of sexual abuse as a child. The trial court properly permitted the prosecution to use CSAAS to rebut the attempts to undermine Jane Doe's credibility, regardless of whether there was any evidence the jurors were fully informed about and conversant in the psychology of child abuse victims.

Maciel cites passages from the reporter's transcript at which prospective jurors were asked during voir dire about any preconceived notions they might have about child sex abuse victims, the juror's ability to assess the victim's credibility, and whether any prospective jurors or somebody they knew was a victim of sexual assault. He suggests there was uniform agreement on that subject among all prospective jurors. A few prospective jurors were asked whether they would automatically disbelieve a victim who delayed disclosing the abuse, and those prospective jurors responded they would not. But not all prospective jurors were asked or responded to those lines of questions. And this was voir dire of *prospective* jurors; Maciel does not show whether the empaneled jurors revealed whether any had any preconceived ideas about how child sex abuse victims act or should act.[4]

---

[4] The trial court decided, wisely we believe, not to permit questioning of every single prospective juror on the subject of preconceived notions about the behavior of child sexual abuse victims or what the juror might

28

The trial court, which was of course a witness to the voir dire, found: "[A]s to the jurors making certain statements about what preconceived notions they have, I agree with [the prosecutor]. There's nothing there that would indicate to the Court that they are so understanding of this sort of scenario that they wouldn't benefit from some expert testimony that would assist them in this area." We have no reason to disagree with that assessment.

Maciel argues CSAAS evidence is no longer necessary because, due to awareness campaigns (such as the "Me Too" movement), extensive coverage of child molestation in the news media, on television, and on the internet, the public no longer holds misconceptions about the behavior of sexually abused children. Maciel offers no evidence to support this assumption, and we do not accept it. (*People v. Lapenias, supra*, 67 Cal.App.5th at p. 172.)

### E. *Admission of CSAAS Testimony Did Not Violate Maciel's Due Process Right to Present a Defense*

Maciel argues the admission of CSAAS testimony violated his due process right to present a defense. This argument has no merit. The trial court's decision to allow CSAAS testimony resulted from the application of the rules of evidence and therefore did not infringe Maciel's right to present a defense. (*People v. Lawley* (2002) 27 Cal.4th 102, 155; *People v. Hall* (1986) 41 Cal.3d 826, 834.) Dr. Urquiza's testimony was permitted only to assist the jury in deciding whether or not Jane Doe behaved in a manner consistent with the conduct of someone who has been molested and in evaluating her credibility. (See *People v. Lapenias, supra*, 67 Cal.App.5th at p. 174 [admission of CSAAS evidence did not violate due process]; *People v. Patino, supra*, 26 Cal.App.4th at pp. 1744-1745 [same].)

---

know "about similar situations as this one." The trial court recognized that such questioning would give the attorneys an opportunity to precondition the jurors on the facts of the case.

### III. The Trial Court Did Not Err in Instructing the Jury on Consciousness of Guilt; Any Error Was Harmless

Maciel argues the trial court erred by instructing the jury with CALCRIM No. 362, Consciousness of Guilt: False Statements. We conclude the trial court did not err by giving CALCRIM No. 362, and any error in giving this instruction was harmless.

The trial court instructed on consciousness of guilt by giving a slightly modified version of CALCRIM No. 362, as follows: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

CALCRIM No. 362 gives effect to the principle that "pretrial false statements by a defendant may be admitted to support an inference of consciousness of guilt by the defendant." (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1102; see *People v. Showers* (1968) 68 Cal.2d 639, 643.) Instructing the jury on consciousness of guilt is justified when there is some evidence in the record that, if believed by the jury, "would sufficiently support the suggested inference." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102.)

The Attorney General argues CALCRIM No. 362 was warranted in this case because Maciel made false or misleading statements during his conversation with D.C. and the pretext call. During his conversation with D.C., Maciel was asked if he had sexually assaulted Jane Doe when she was a child. He remained silent for a long time and remained silent when D.C. repeated the question and assured Maciel of his love. After about an hour of silence, Maciel denied the allegations without offering an explanation or trying to correct a perceived misunderstanding. At the end of the

conversation, he asked D.C. to forgive him and said "he wished that we would never become like him." His silence, followed by a denial and then by comments suggesting he had done something bad enough to warrant forgiveness, is at least misleading, and provided a sufficient factual basis for instructing the jury with CALCRIM No. 362. (See *People v. Whitehorn* (1963) 60 Cal.2d 256, 262 [silence or denial made with false and equivocal replies indicates consciousness of guilt].)

Maciel argues it is error to give CALCRIM No. 362 when a finding of guilt is necessary to make the defendant's pretrial statement false. In that situation, Maciel contends, CALCRIM No. 362 is logically circular. The California Supreme Court has rejected that argument. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1108.) Maciel also suggests CALCRIM No. 362 violated his constitutional rights to due process and a jury trial by lessening the prosecution's burden of proof or shifting that burden to him. The California Supreme Court has rejected constitutional challenges to consciousness of guilt instructions. (*People v. Howard* (2008) 42 Cal.4th 1000, 1024-1025.)

If the trial court erred by giving CALCRIM No. 362, the error was harmless. CALCRIM No. 362 is conditional: It applies only "[i]f" the defendant made a false or misleading statement. The jury decides whether the defendant made such a statement. If, as Maciel contends, he did not make a false or misleading statement supporting an inference of consciousness of guilt, then, in accordance with the instruction the jury would have disregarded CALCRIM No. 362. Instructing the jury with CALCRIM No. 362 did not suggest that Maciel did in fact make a false or misleading statement because the jury was also instructed by CALCRIM No. 200 that some instructions might not apply, depending on the jury's findings, and not to assume anything about the facts just because the court gave a particular instruction. "We presume jurors understand and follow the instructions they are given." (*People v. Buenrostro* (2018) 6 Cal.5th 367, 431.)

31

In addition, CALCRIM No. 362 is designed to benefit the defense by clarifying that the defendant's deceptive or evasive statements are not sufficient to prove defendant's guilt, by allowing the jury to determine the weight and significance of the statements, and by """"admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory.""" (*People v. Burton* (2018) 29 Cal.App.5th 917, 925.)  Without CALCRIM No. 362, the jury could have found that Maciel's request for forgiveness and wish that D.C. would not become like him were decisive proof of guilt.

In light of the conditional nature of the instruction, the court giving CALCRIM No. 200, the benefit to Maciel of giving CALCRIM No. 362, and our consideration of the entire record, we conclude it was not reasonably probable Maciel would have obtained a more favorable verdict had the trial court not instructed the jury with CALCRIM No. 362.  (*People v. Watson, supra*, 46 Cal.2d at p. 836.)

### IV.  Failure by Maciel's Trial Counsel to Object to the Fines, Fees, and Assessments Was Not Prejudicial

The trial court imposed the following fines, fees, and assessments:  (1) A sex offender fine and assessments of $1,230 pursuant to section 290.3; (2) a restitution fine of $5,000 pursuant to section 1202.4, subdivision (b); (3) a parole revocation fine of $5,000 pursuant to section 1202.45 (fine stayed); (4) a court operations assessment totaling $1,040 ($40 for each conviction) pursuant to section 1465.8, subdivision (a)(1); and (5) a criminal conviction fine of $780 (Gov. Code, § 70373).  Maciel argues, pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1172-1173 (*Dueñas*), his trial counsel was ineffective for not objecting to these fines, fees, and assessments on the ground Maciel is unable to pay them.

The Attorney General takes the position that the matter must be remanded to recalculate the amount of the sex offender fine under section 290.3 and, on remand, Maciel can object to the fines, fees, and assessments on the ground of inability to pay

them.  Although we are remanding the matter for the limited purpose of recalculating the sex offender fine and relevant assessments, we conclude the trial court is not required under *Dueñas* to make a determination of Maciel's ability to pay.

The *Dueñas* court held due process of law requires a trial court to determine a defendant's "present ability to pay" before imposing court security assessments, criminal conviction assessments, and restitution fines.  (*Dueñas, supra*, 30 Cal.App.5th at pp. 1164, 1169-1172.)  While recognizing the state has a legitimate interest in imposing revenue-raising fees on people who break the law, the court stated, "[i]mposing unpayable fines on indigent defendants is not only unfair, it serves no rational purpose, fails to further [any] legislative [policy], and may be counterproductive."  (*Id*. at p. 1167.)  Indeed, the court found the financial consequences at issue in that case did little more than punish the defendant for being poor and diminish her chances of ever successfully completing probation.  (*Id*. at pp. 1166-1172.)  Accordingly, *Dueñas* held, as a matter of first impression, that trial courts must conduct an ability-to-pay hearing before imposing such financial burdens on a criminal defendant.  (*Ibid*.)

The defendant in *Dueñas* was a poor, mentally and physically challenged homeless woman who suffered an array of "cascading consequences" because she could not afford to pay various fines and fees that had repeatedly been levied against her for committing minor offenses related to her indigency.  (*Dueñas, supra*, 30 Cal.App.5th at p. 1163.)  Not only did she lose her driver's license, but she was also subjected to additional jail time and the prospect of civil collection efforts, all because she lacked the means to pay off her original financial obligations arising from earlier cases.  (*Id.* at pp. 1161-1164.)  Given that her criminal history stemmed largely from her basic lack of monetary resources, the *Dueñas* court determined there was no rational purpose for subjecting her to yet more financial burdens in her current case, and therefore the trial court's reluctant decision to do so violated due process.  (*Id.* at p. 1167.)

33

This case differs from *Dueñas*. Here, there is nothing to suggest Maciel's convictions were attributable to any financial penalties he may have been ordered to pay in any prior case. That is a key point of distinction from *Dueñas*, in which the financial penalties triggered by the defendant's initial crimes had severe consequences on her daily life and actually created the conditions that contributed to her current offenses. (See *People v. Caceres* (2019) 39 Cal.App.5th 917, 923, 928 [distinguishing *Dueñas* on that basis]; *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844 [same].)

Any failure on the part of Maciel's trial counsel to object to the fines, fees, and assessments was not prejudicial, and therefore did not amount to ineffective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Cain* (1995) 10 Cal.4th 1, 28.)

Maciel argues the fines, fees, and assessments imposed in this case were constitutionally excessive under the Eighth Amendment to the United States Constitution. In support of that argument, he cites *Timbs v. Indiana* (2019) 586 U.S. __ [139 S.Ct. 682] (*Timbs*). But the only issue decided in *Timbs* was whether the Eighth Amendment's excessive fines clause was incorporated into the Fourteenth Amendment's due process clause, and therefore equally applied to the states. (*Timbs, supra*, 586 U.S. at p. __ [139 S.Ct. at pp. 686-687].) The Indiana Supreme Court had not addressed whether the civil forfeiture of Timbs's $42,000 Land Rover was excessive in light of the underlying facts. Instead, the court held the excessive fines clause constrains only federal action, and is therefore inapplicable to the states. (*Id*. at p. __, [139 S.Ct. at p. 686].) Reversing and holding that it is, the Supreme Court did not address whether the "fine" imposed in Timbs's case was excessive but instead remanded the matter to the Indiana Supreme Court to make that determination. (*Id*. at p.__ [139 S.Ct. at p. 691].)

A fine is excessive under the Eighth Amendment "if it is grossly disproportional to the gravity of a defendant's offense." (*United States v. Bajakajian*

34

(1998) 524 U.S. 321, 334.)  In a gross disproportionality analysis, a court considers four factors:  "(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay."  (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1070.)  "While ability to pay may be part of the proportionality analysis, it is not the only factor."  (*Aviles, supra*, at p. 1070.)

Maciel addresses only the ability to pay factor and therefore has failed to establish the fines and fees were disproportionate to his crimes.  No gross disproportionality appears on the record before us.  Maciel's crimes were grave indeed and his culpability was great.  Over a 10-year period, he repeatedly committed disgusting acts of sexual abuse on Jane Doe.  He started abusing Jane Doe when she just four or five years old and stopped only when J.V. caught him molesting her in the upstairs bedroom.

### V.  The Sex Offender Fine Must Be Recalculated

The trial court imposed the sex offender fine of $1,230 pursuant to section 290.3, subdivision (a) (section 290.3(a)).  The court stated that amount consisted of a $300 base fine plus penalty assessments.  The court did not explain how it came up with $930 in penalty assessments or the statutory basis for them.  The abstract of judgment reflects a fine of $1,230 pursuant section 290.3 without breaking down the components of that fine.

Maciel argues the abstract of judgment should be corrected to reflect a sex offender fine of $300.  The Attorney General counters that the matter should be remanded for the trial court to recalculate the amount of the sex offender fine and assessments.  We agree with the Attorney General, in part.

Section 290.3(a) states, in relevant part:  "Every person who is convicted of any offense specified in subdivision (c) of Section 290 shall, in addition to any imprisonment or fine, or both, imposed for commission of the underlying offense, be

35

punished by a fine of three hundred dollars ($300) upon the first conviction or a fine of five hundred dollars ($500) upon the second and each subsequent conviction, unless the court determines that the defendant does not have the ability to pay the fine." This fine is subject to a number of statutorily-imposed penalty assessments. (*People v. Hamed* (2013) 221 Cal.App.4th 928, 940-941 (*Hamed*).)

Penalty assessments attendant to the imposition of a sex offender fine under section 290.3 must be specified in the trial court's oral pronouncement and specifically listed in the abstract of judgment. (*Hamed, supra,* 221 Cal.App.4th at p. 937.) In *Hamed*, the trial court imposed a $1,230 sex offender fine under section 290.3 without specifying how it arrived at that amount. (*Id.* at pp. 933-934, 940.) The Court of Appeal found no need to remand because it was able to correct the error by recalculating the amount of the fine and assessments and order the preparation of an amended abstract of judgment. (*Id.* at p. 940.)

The trial court in the present case erred by imposing $930 in assessments without specifying how it arrived at that amount. In addition, the trial court erred by imposing a base fine of $300. The crimes in this case were committed from 1992 through 2003, when the amount of the sex offender fine was lower than the base amount imposed by the trial court.[5] Ex post facto principles require fines to be calculated as of the date of the offense. (*People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1248.) The various penalties and assessments likewise must be calculated based on the law in effect when the crimes were committed. The statutes imposing the penalty assessments have been enacted and amended over time, and "the amount of the assessment will depend on the base fine at issue, the date of the offense, and the county where the penalty is imposed." (*Hamed,* supra, 221 Cal.App.4th at pp. 936-937.) Given these

---

[5] As the Attorney General points out, section 290.3 as originally enacted in 1988 imposed a base fine of $100 upon the first conviction and $200 upon the second and each subsequent conviction. (Stats. 1988, ch. 1134, § 1.) In 1994, section 290.3 was amended to increase those base fines, respectively, to $200 and $300. (Stats. 1994, ch. 866, § 1.)

complications, we believe the better course of action is to remand the matter to the trial court to recalculate the amount of the sex offender base fine and assessments.

The Attorney General contends the trial court erred by imposing the base fine only upon Maciel's first conviction and should have imposed a base fine upon the convictions for the remaining 25 counts. The prosecutor did not object when the trial court imposed a single base fine of $300. Because the trial court had the discretion to not impose the sex offender fine, the prosecutor's failure to object forfeited any claim of error on appeal. (*People v. Tillman* (2000) 22 Cal.4th 300, 302-303; *People v. Sharret* (2011) 191 Cal.App.4th 859, 864.) The trial court may impose a base fine only upon Maciel's first conviction.

## DISPOSITION

The sex offender fine under section 290.3 and related assessments are stricken and the matter is remanded with directions to the trial court to recalculate the fine and assessments in accordance with this opinion, prepare an amended abstract of judgment, and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.



                                                    BEDSWORTH, J.

WE CONCUR:



O'LEARY, P. J.



MARKS, J.*
*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

37